FILED
2014 Sep-24  AM 11:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GUY REDD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CV-12-BE-3986-S** |
| | ) | |
| **UNITED PARCEL SERVICE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff Guy Redd asserts claims of race discrimination, brought pursuant to Title VII and § 1981, and retaliation, brought pursuant to Title VII and the Civil Rights Act of 1866, as amended.  The matter comes before the court on "Defendant United Parcel Service, Inc.'s Motion for Summary Judgment."  (Doc. 34). The Plaintiff responded (doc. 40), and the Defendant has replied (doc. 45); this motion has received thorough briefing. For the reasons stated in this Memorandum Opinion, the court FINDS that the motion for summary judgment is due to be GRANTED as to all remaining claims.

## I.  FACTS

In 1984, the Defendant, United Parcel Service, hired the Plaintiff, Guy Redd, an African American male.  Redd has held a number of different positions over the years, both hourly and in management.  In 2005, after more than twenty years at UPS, Redd assumed his first management role, and the next year he became a Business Manager at UPS's Birmingham facility.  The

Birmingham facility includes three package centers as well as a Preload operation—an early operation during which packages are unloaded from trailers and loaded onto UPS trucks—and a Local Sort operation—a late afternoon operation during which the packages obtained from customers during the day are sorted onto feeder trucks for further processing.

UPS Business Managers report directly to a Division Manager who oversees multiple UPS facilities.  When Redd first became a Business Manager, he reported to Division Manager Stan Garrett, also African American.  Garrett testified that Redd's performance in 2006 and 2007 did not fully meet expectations, and he placed him on a Management Performance Improvement Plan (MPIP) at least one of those years[1], a plan that is intended to help a member of management succeed.

Redd next reported to Division Manager Dale Mowery, a Caucasian, and UPS reassigned Redd from the Birmingham Central package center to the early morning Birmingham Preload operation.   Although the exact period that Mowery supervised Redd is unclear, Mowery ceased to be Redd's division manager in the summer of 2009.

---

[1] The court acknowledges Redd's argument that Garrett's deposition testimony was different than his subsequent affidavit testimony regarding placing Redd on MPIP in the 2006-2007 period.  Redd testified in his deposition that he thought he placed Redd on MPIP for performance issues but was not sure.  (Garrett Dep. Doc. 36-11, at 10, p. 37).  However, after stating three times during his deposition that he *thought* he put Redd on an MPIP during that period, his subsequent affidavit confirming that belief is not inherently inconsistent and contradictory, but merely a confirmation and/or clarification.  *See Van T. Junkins & Assoc., Inc. v. U.S. Inds., Inc.,* 736 F.2d 656, 658 (11th Cir. 1984) (explaining the difference between a sham affidavit and an affidavit that explains and clarifies certain aspects of prior deposition testimony); *see also Latimer v. Roaring Toyz, Inc.,* 601 F.3d 1224, 1237 (11th Cir. 2010) (stating that the sham affidavit rule "is applied sparingly because of the harsh effect it may have on a party's case" and that a court must "find some inherent inconsistency between the affidavit and a deposition before disregarding the affidavit.")

On October 23, 2008, Redd claims to have complained to former UPS Employee Relations Manager Guy Sciro about alleged discrimination against him by Mowery and UPS Security Manager, Tim Breedlove, also a Caucasian.  Both Redd and Sciro confirm that Redd met Sciro at a Jack's Hamburger's fast food restaurant, and asked Sciro to read a four-page memorandum from Redd to "UPS" with a copy to Jeff Poulter, UPS's Alabama Human Resource Manager[2]  regarding "Unmerited Treatment."  In the memo, Redd identified himself as a "Black male"; complained about the manner in which Dale Mowery, a Caucasian Division Manager, and Tim Breedlove, a Caucasian Security Manager, treated him and questioned his integrity during an August 2008 interview regarding a weekend security audit; queried on page four whether the motivation behind their treatment was a "racial issue"; mentioned his fear that he was being "targeted"; and requested that UPS undertake a "formal investigation."  (Redd Dep. Doc. 36-2, at 10-13).

According to Redd, he told Sciro specifically that he thought he was being discriminated against because of his race, and gave Sciro a copy of the memo to take with him.  Redd did not give a copy of the memo to Poulter directly, but Redd testified that Poulter knew about the memo because Poulter came out to the Preload operations on October 24, 2008, the next day, and said to Redd: "I've got your memo[3], but I've got to find somebody and do something, and I'll get with

---

[2]The briefs' Statements of Facts did not disclose Poulter's race.

[3] In Sciro's deposition testimony, he acknowledged meeting his friend Redd at Jack's off the corporate campus in October of 2008 and reading the memo complaining about the way Redd was interviewed about the audit.  However, Sciro disputes that Redd gave him a copy of the memo to take with him, disputes that Sciro gave Poulter a copy of the memo, disputes that Sciro understood Redd's complaint about the interview had a racial component, and disputes that Sciro told Poulter that Redd's complaint had a racial component.  In light of Redd's testimony that he gave Sciro the memo and that  Poulter specifically said he had received the memo, the court must

you later." (Redd Dep. Doc. 36-1, at 82, p. 327).  However, Poulter never got back with Redd about his complaints in the memo, and no evidence exists that UPS conducted an investigation of the memo's complaints.

In the summer of 2009, UPS demoted Mowery, transferring him out of Alabama, and Redd reported to an interim manager for a few months.  From September 2009 until early April 2010, Redd next reported to Jaime Diaz, who is Hispanic and was new to Alabama, having transferred in from Kansas on August 1, 2009.  Diaz had no communication with Redd's former manager Mowery about Redd; Diaz testified that he did not receive any assessments of his new charges and considered all to have a clean slate.

When Diaz became his Division Manager in August, Redd was responsible for the Preload operation and Birmingham Central package center.  Diaz testified that he concluded Redd was struggling with his responsibilities.  The Business Manager on the Local Sort at that time, Bob Kibler, a Caucasian, had several more years of operations experience than Redd, including more experience with the Preload operations.  Diaz testified that the months before the winter holidays represent UPS's peak season, so with peak season approaching, he switched Kibler and Redd, moving the more experienced Kibler to the Preload position, a job that handled twice the volume of packages that Local Sort handled.  According to Diaz, he considered the move a lateral one for Redd, as Redd retained the title of Business Manager and no change

---

view this evidence in the light most favorable to Redd and assume for the purposes of summary judgment that both Sciro and Poulter received and read the memo.  The memo raised the question whether Redd had been unjustly treated *because of race* and requested a formal investigation.

occurred in his pay or benefits.  Redd retained the responsibility for the Birmingham Central package center.

Redd, however, did not like the change in job duties or the evening hours, considering the Local Sort position less desirable.   Redd considered Diaz to be overly critical of him, holding him accountable for improper actions and poor attendance of Presort hourly employees and supervisors, and Redd believed that the job change and Diaz's criticism of him was based on racial discrimination and retaliation for the 2008 complaint about Mowery.

After Redd's move to Local Sort, two serious service failures occurred in Local Sort operation under his management, one in January of 2010 and in March of 2010.  The January 2010 incident resulted in a service failure involving more than 2,400 packages.

Diaz testified that he continued to view deficiencies in Redd's performance after the move to Local Sort, determining that Redd needed to improve his performance on late and missed service issues and that Redd's operation needed improvement in the area of net delivered pieces per hour (a measure of time required to complete delivery of packages for Redd's package center); the range of dispatch (the distribution of package volume among the package cars for Redd's package center); and Local Sort pieces per hour (a measure of the efficiency of the flow of packages).  According to Diaz, he evaluated Redd's performances in these areas as worse than the other Business Managers reporting to Diaz, and therefore, placed Redd on an MPIP on or about January 15, 2010.

Redd proffers UPS's Alabama District Balanced Scorecard for January of 2010 as evidence that he was not performing poorly, showing that the Birmingham Central unit under his management ranked nine out of thirty-one Alabama units.  The scorecard does not purport to

5

rank individual employees, but ranks whole units by location.  The other Birmingham units under Diaz's control were Birmingham SE—ranked seven out of 31 Alabama units—and Birmingham SW—ranked 21 out of 31 Alabama units.  During the latter half of January, Redd was on MPIP with increased monitoring and accountability, and the evidence does not reflect the ranking of the unit under Redd's management in the months *before* Diaz placed him on MPIP.  Redd provided no other Scorecard and no other evidence evaluating the performance of other Business Mangers under Diaz.

In his declaration, Diaz testified that the purpose of the Scorecards is *not* to measure the performance of individual Business Managers, and the Scorecards are *not* valid measures of any particular Business Manager's performance because "many of the elements reflected on the scorecard do not correlate to things within an individual manager's control and there are factors that might improve or reduce the ranking of areas of operation listed on the [Scorecards] for which a Business Manager has no accountability or right to claim credit."  (Diaz Decl. Doc. 36-5 at 10).

From Redd's point of view, Diaz continued to treat him unfairly after the move to Local Sort, and Redd characterizes as discriminatory and/or retaliatory the following actions that Diaz took after the move:  requiring Redd to complete the tasks of others, including Kibler; requiring Redd to investigate overtime for employees not assigned to him; requiring Redd to review concerns that were not part of his center; requiring Redd to monitor drivers in other centers as well as his own; continuing to hold Redd accountable for Preload employees' actions and errors even though Redd was no longer the Preload manager; and, ultimately, placing Redd on an MPIP.

6

The MPIP was intended to be a useful tool for performance improvement, and during the pendency of the MPIP, Redd's position, job duties, salary, and benefits remained the same. The MPIP called for specific corrective steps and enumerated objective goals with processes to be in place by January 22, 2010, a week after Redd's placement on the MPIP, with a final review in 90 days. Redd, Diaz, and Poulter signed the MPIP, and Redd understood the consequences of failing to improve. In his deposition testimony, Redd objected to the fairness of the piece-per-hour number because Local Sort had not achieved that number in ten years. Diaz held follow-up meetings with Redd on at least three occasions but those meetings ceased when Redd submitted a complaint against Diaz in February 2010.

On February 14, 2010, Redd submitted a two-page memo to HR personnel at UPS, entitled "Unjust Treatment," asserting that Diaz's placing him on MPIP was discriminatory and represented retaliation for his *October 2008* complaint about Mowery's treatment of him:

> I assert that I am experiencing retaliation for Dale Mowery's disciplinary reassignment, in the form of unfair and unjust treatment, racial discrimination, and disparate treatment.
>
> After Mr. Mowery was reassigned . . . the disparate action by the Alabama District, and more specifically, Jaime Diaz, the new Central Division Manager began.
>
> The most current example is I was placed on MPIP. I will forward this report and other substantiating information at a later date.
>
> Although I realize some time has passed since my original EDR concern, it still concerns me that the program failed to work for me, and the parties cited in the complaint. It is a possibility that if my original concern had been addressed, there would be little aftermath and no need for this subsequent request for assistance.

(Redd Dep. Doc. 36-2, at 8-9).  The attachments to the memo were 29 pages long, focused on the period *before* Mowery's demotion, and included a copy of Redd's October 23, 2008 memo questioning whether *Mowery*'s treatment of him was a racial issue and requesting a formal inquiry.  (Redd Dep. Doc. 36-2, at 10-13).

After UPS received this February memo, Poulter met with Redd on a Sunday afternoon at a restaurant.  Poulter recalls that the purpose of the meeting was to listen to Redd's concerns and to see if he could assist Redd with making his job more tolerable.  Poulter did not take notes during the meeting and did not ask Redd to discuss treatment he believed to be discriminatory. Poulter acknowledged that the February memo from Redd was not the first complaint Poulter had received accusing Diaz of misconduct at work; within a few months of Diaz's move to Alabama, Poulter began receiving complaints of Diaz's harassment, discrimination, and retaliation.  One anonymous complaint accused Diaz of holding African American members of management to a higher standard of accountability than white management, and some of the other complaints that were not anonymous involved African Americans complaining of Diaz's demeaning behavior and race discrimination.

On March 4, 2010, Sciro met with Redd at Redd's request, and Redd was so upset about Diaz's treatment of him that he was in tears.  Redd submitted a write-up to Sciro that Sciro sent along to Poulter, presenting documentation showing, from Redd's perspective, that Diaz's treatment of him was unwarranted and that Diaz did not have all the facts when he accused Redd of not doing his job.  Redd subsequently left work to go to the doctor and Sciro advised Poulter that Redd would be off work for a week.

On March 5, 2010, a meeting took place at corporate headquarters in Atlanta with Diaz, Poulter, and two HR personnel, Tim Robinson and Major Warner, to discuss complaints against Diaz.  After this meeting and an investigation, UPS determined that Diaz was not sufficiently credible with his answers to questions at this meeting, and the company would later transfer Diaz out of the Birmingham center.  UPS transferred Poulter in March of 2010, and the investigation of Redd's complaints, which Poulter had begun, was still open at the time of Poulter's transfer.

Also on March 5, 2010, Redd filed an EEOC Charge checking boxes for race discrimination and retaliation.  The charge mentioned an October 2008 complaint of discrimination, focused on a manager who was "eventually demoted," and subsequent retaliation and discrimination as follows: "I have been denied leave, denied the use of my expense account, assigned raters who are at pay Grade 18, and assigned tasks that do not relate to my duties which should have been given to other managers.  In September 2009, I was moved from Preload Sort to Local Sort, which is a less desirable position.  In January 2010, I was placed on an improvement plan." (Redd's Dep. Doc. 36-2, at 6).

Redd's EEOC Charge occurred the same month as UPS's announcement of its reorganization and consolidation of its package operation, resulting in a consolidation of UPS's Alabama District into its Mid-South District and extensive changes in management and HR personnel responsible for the Birmingham package facility.

On April 20, 2010, UPS transferred Diaz to Tuscaloosa, Alabama, a move that UPS characterized as a demotion, and he worked there and received similar complaints from African American employees until he retired.  After Diaz's transfer, Stan Garrett, who is African American, once again took the position of Division Manager at the Birmingham location, and

Redd reported to him.  Garrett continued Redd's assignment as Business Manager of Local Sort, but shifted Redd's package center responsibility from the Birmingham Central package center to the Birmingham Southwest package center.  When Garrett took over the Division Manager position, no one advised Garrett that Redd was operating under an MPIP. After he took this position,  Garrett did not discipline Redd in the intervening months between April 2010 and June 2010, when, as discussed below, a serious service failure occurred in the area Redd managed.

Also in April of 2010, Harry Wilson, the African American HR Director for UPS who was located in Nashville, came to Birmingham to meet with Redd and two other people: Stan Garrett, Redd's African American supervisor; and Lonzell Wilson, the African American in charge of investigating EEOC charges in Alabama, including Redd's charges.  Harry Wilson acknowledged that the reason for the meeting was to review Redd's recent complaint about Diaz, to see if they could help Redd with the situation, and to encourage Redd to move forward.  At the meeting, Redd was told that if he dropped his EEOC charges others would drop theirs as well. Harry Wilson also asked Redd if he could do anything to help him.

On June 3, 2010, another serious service failure occurred on the Local Sort operation that Redd managed, causing untimely delivery of a substantial number of UPS packages.  A serious service failure involves a failure to make timely delivery of a substantial volume of packages entrusted to UPS.  The problem began with a belt failure after Redd had left the UPS premises. When a supervisor called Redd and notified him of the belt problem, Redd came back to the UPS building that evening to address the issue, and directed Ryan Martin, an employee under Redd's control, to ensure that all packages left in the building were counted and scanned so that UPS would know how many and which packages were involved.  After Redd had left the building but

10

was still in the parking lot, Martin told Redd over the phone that a total of 114 packages were

impacted, 80 of which were ground and the remainder of which were next-day air packages.

Redd did not return to the building to walk through and confirm that Martin and other employees

had counted and scanned all remaining packages, but, relying on Martin's information, Redd

reported the 114 number to Operations Manager Linda Nelson.[4]

At 7:00 AM on the morning of  June 4, 2010, another Business Manager informed Redd

that the count of the remaining packages was not 114 but over 300:  an additional 161-162 air

packages for which the customers had paid a premium had been left in the building, had not been

scanned, and were not part of the package count Redd had provided to Nelson on June 3.  Redd

never saw documentation and confirmation of the additional numbers, and when Redd arrived on

June 4, he did not confirm the additional numbers of remaining packages.

According to Nelson, Redd did not notify her of the change in numbers on June 3,

although she had asked him the night before to notify her of any changes regarding the remaining

packages.  Rather, she learned of the problem on the morning of June 4 when *another* manager

called her and advised her that the numbers of remaining packages were substantially greater

than 114.   Upon learning of the discrepancy, Nelson immediately went to the unload area where

the packages remained.  Although Redd had told her the night before that all the remaining

packages had been scanned, Nelson found remaining packages with no scans.  She also learned

that Redd had received notification at 7:00 AM of the increase in remaining package numbers,

that he had arrived in the building, but that an hour and forty-five minutes after receiving notice

of the enlargement of the problem, he had not  notified her of the additional packages, he had not

---

[4] The briefs' Statements of Facts do not reveal Nelson's race.

gone back to the unload area to confirm the status of the packages, he had not ordered scans of the additional unscanned packages, and he had not otherwise addressed the additional service failures.  Nelson testified that when she confronted Redd about the problem at 8:45 AM, he was sitting in his office, and he hung his head and told her he did not know about the true scope of the problem until that morning.  Nelson walked Redd back to the unload area, which Nelson estimates as being about a hundred yards from Redd's office, and Nelson accused Redd of hiding the enlarged scope of the problem when he learned about it that morning. Nelson requested that an investigation of the service failure be conducted.

Consistent with UPS protocol for serious service failures, the company conducted an investigation of the service failure at Nelson's request; Ron Headley, who was unaware of Redd's EEOC Charge, performed the investigation, and provided the materials collected during the investigation to Garrett, Redd's supervisor.  Garrett had been on vacation during the service failure, and received the investigation material when he returned.  Included in the investigation materials were emails from Headley; and UPS reporting documents regarding exception scans package movements, and tracking numbers.  The materials also contained statements from witnesses to the event, including the following:  Redd; Nelson; Martin; Ryan Baker, Birmingham Local Sort Supervisor; Fred[5], who was in charge of the airport shuttle on June 3; Josh Young, inspector of packages on June 4; and Mike Boone, inspector of packages on June 4 with Young.  Headley's email, included in the investigative materials, noted that the June 2011 investigation was the "4th Serious Service Failure Investigation conducted on the Local Sort since Sept.

---

[5] The materials did not disclose Fred's last name.

2009[6]," which was approximately the time Redd took over Local Sort responsibilities.  (Garrett Decl. Doc. 36-6, at 52).  As is typical when an investigation ensues, Garrett required Redd to prepare his own write-up of the event.  In Garrett's judgment, Redd failed to acknowledge his own failures in the first write-up, so he instructed Redd to prepare a second write-up including and addressing those failures.

On June 11, 2010, UPS's attorneys responded to Redd's EEO charge with a "position statement." (Doc. 39-19, at 2-6).

On July 19, 2010, UPS demoted Redd from Business Manager to On-Road Supervisor, based in part on the information received during the investigation into the June service failure. Garrett was the sole decision maker in his demotion, but, before making the decision, he spoke with Nelson, who agreed with the decision, and he probably spoke with HR personnel such as Lonzell Wilson.  Garrett testified in his declaration that he demoted Redd in part because he did not manage the June 3-4, 2010 incident properly after he returned to the UPS building on the evening of June 3 and on the morning of June 4: specifically, Redd left the building a second time without ensuring that all remaining packages were properly scanned and counted and without ensuring that all efforts had been exhausted to dispatch the packages that evening. Garrett also stated that other matters factored into his decision: Redd's failure to notify Nelson when he learned before she did that significantly more than the reported 114 packages were

---

[6] The Statement of Facts refer to *three* serious service failures occurring on Local Sort in 2010 (January, March, and June), and this email refers to *four* occurring during the period from September 2009 through June 4, 2010.  Accordingly, logic suggests that if a fourth failure occurred from September 2009 through June 4, 2010, it would have occurred sometime in the last four months of 2009; however,  the Statement of Facts do not reflect any further information about the fourth failure.

affected, waiting for her to learn from another source; Redd's failure to acknowledge his own accountability for the June 3-4 service failure, attempting to deflect responsibility onto employees under his management; and Garrett's knowledge that other serious service failures had previously occurred on the Local Sort in 2010 under Redd's management.  In his deposition testimony, Garrett similarly explained that he demoted Redd because of service failures.[7] Garrett did not demote Martin, the supervisor working under Redd on June 3-4, and the record does not reflect that anyone other than Redd received discipline as a result of that incident.

Nelson testified that she concurred with the Division Manager's demotion recommendation and stated that, from her perspective, Redd had responsibility for the service failure regardless of whether he had delegated counting packages and scanning to somebody else because, as the senior person in charge, Redd had the obligation to follow up and make sure his orders were carried out, but he did not do so.  Further, she testified that, from her perspective, Redd had an integrity issue in failing to report to her the additional set of undelivered packages when he learned before she did about the increased numbers on June 4.

Bob Kibler, the Business Manager who replaced Kidd on Pre-Sort in 2009, testified that when a service failure occurred, UPS would scan all undelivered packages to ensure that an

---

[7] Redd objects to UPS's undisputed facts based on Garrett's declaration in which Garrett states that Redd's demotion was based in part upon previous service failures in January and March of 2010 that occurred under Redd's management; Redd objects that the declaration conflicts with Garrett's deposition testimony.  Although Garrett did not discuss the January and March service failures in his deposition testimony when discussing Redd's demotion, he did refer to service failures and service issues in the plural when asked why he demoted Redd.  Given Garrett's reference to service failure*s* and given the lack of any specific deposition questions regarding past service failures and their effect on Redd's demotion, Garrett's deposition discussion focusing on the final service failure on June 3-4, 2010 does not conflict with his declaration testimony and render it a sham.  *See Latimer,* 601 F.3d at 1237.

accurate report was generated.  The Business Manager would not perform the actual scanning but would instruct an employee to do so.  When asked whether the supervisor was supposed to make sure the packages were scanned, Kibler responded, "You would have a follow-up, yes."  (Kibler Dep. Doc. 36-10 at 20, p. 77).  Kibler testified that he personally was never disciplined for a service failure, and he does not recall having a belt breakdown when he was not at the facility or did not go back to the facility.  Although he acknowledges that no one ever told him he was required to go back to the facility when a belt broke, he said: "I would [go back to the facility] because you– the responsibilities that you had, you would want to make sure that was done correctly and that you had— because you were going to be asked questions and you would want to be able to give good answers."  *Id*. at 19, p. 76.  He did not specifically state that a Business Manager was not ultimately responsible for inaccurate counts or failures to scan packages nor did he say that a Business Manager should not verify that those acts were performed before leaving the premises.

Redd has remained continuously employed at UPS in the position of Supervisor since his demotion in July of 2010.  He challenged the demotion through UPS's Employee Dispute Resolution program, and a panel of three UPS employees who are not part of his chain-of-command heard his complaint.  The peer review panel determined that Redd's demotion was appropriate and should not be reversed.

Redd has also challenged the demotion by filing a second EEOC charge on January 6, 2011, marking the boxes for race and retaliation, and explaining in part as follows:

> I am an African American male employed with UPS and I filed a Charge of Discrimination on March 5, 2010, regarding my claims for racial

discrimination and retaliation.   I was unjustly demoted from my position as
Business Manager to On-Road Supervisor. . . .

I believe I have been demoted because of my race, African American, and in
retaliation for my EEOC charge and engaging in protected activity . . . .

(Redd Dep. Doc. 36-2, at 7, Ex. 16).

Redd was replaced as Local Sort Business Manager by Debbie Bundrum, a white female,
and he continues to work for UPS in the position of Supervisor.

*Comparators*

In his responsive brief, Redd points to two adverse job actions for his race discrimination
claims:  Garrett's demotion of Redd and Diaz's placing Redd on MPIP.  In his responsive brief,
the only comparators that Redd specifically names and discusses are Jeff Gibbs and David Ray,
white employees whom Garrett did not demote.   Redd names no white comparators as to the
placement on MPIP[8], and argues that, based on the holding in *Smith v. Lockheed-Martin*
*Corporation,* 644 F.3d 1321 (11th Cir. 2011), a comparator is not required.  However, the
Complaint specifically mentions Bob Kibler as a comparator and the responsive brief refers to
Kibler in the brief's argument section discussing comparators.  Therefore, in an abundance of
caution, the court will also consider Kibler as a potential comparator, along with Gibbs and Ray.[9]

---

[8] The court notes that the Complaint names Bob Kibler as a comparator regarding the
alleged adverse employment action of moving Redd from Preload Sort to Local Sort, but Redd's
responsive brief does not discuss that move as an adverse employment action for race
discrimination; it discussed only Diaz's placement of Redd on MPIP and Garrett's demotion of
Redd in 2010.  Accordingly, the court FINDS that Redd has abandoned any claim for race
discrimination based on the move from Preload Sort to Local Sort.  *See Resolution Trust Corp. v.*
*Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995) ("grounds alleged in the complaint but not
relied upon in summary judgment are deemed abandoned").

[9] The court notes that Redd's Statement of Facts includes many facts about potential
white comparators, but the argument section of the brief does not discuss comparators except

16

The court will only address those three named employees as potential comparators, and will not list facts regarding other comparators who were not named and discussed in the argument section of the responsive brief about comparators.

<u>Jeff Gibbs</u>

On February 15, 2010, Jeff Gibbs was the Caucasian Business Manager for a Panama City operation under Garrett's supervision; at Gibbs's unit on that date, holiday packages were placed in a package car and were not scanned to give the packages the closed holiday exception. Someone working under Gibbs had failed to perform his job correctly resulting in an error in the system and a service failure. Gibbs had been the Business Manager for some time when this incident occurred. No record existed that Gibbs had made any complaints of discrimination, retaliation, or harassment either to UPS or the EEOC about UPS. Garrett did not demote Gibbs as a result of the service failure, but the facts do not reflect that Gibbs's own conduct contributed to and/or increased the scope of that service failure. The facts do not reflect that any other serious service failures occurred at Gibbs's unit within the six months before or after this service failure.

---

Gibbs and Ray and, possibly, Kibler. The court's role is not to define a plaintiff's claims, and the court determines that Redd has failed to formulate arguments involving those comparators if he did not discuss them in the argument section of his brief, and, thus, has waived his claims involving those comparators. *See Resolution Trust,* 43 F.3d at 599 ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment .... Rather, the onus is upon the parties to formulate arguments...."). To the extent, if any, that Redd proffers comparators not discussed in the argument section and has not abandoned claims involving those comparators, the court acknowledges UPS's objection to "evidence" that Redd presents in his declaration supported by Exhibit B, listing other serious service failures involving potential comparators. The court agrees with UPS that Redd has not established a foundation of his personal knowledge about that information and has not otherwise met his burden of showing that the information could be presented in a form that would be admissible in evidence. *See* Fed. R. Civ. P. 56(c)(2).

David Ray

On January 5, 2010, David Ray, Caucasian, was the Business Manager for the Dothan unit under Garrett's purview when a clerical employee under Ray's general supervision failed to follow proper scanning procedures, resulting in a ground service failure affecting 93 packages. Garrett did not demote David Ray, who was an experienced Business Manager at the time. Garrett was not aware that Ray had made any complaints of discrimination, retaliation, or harassment either to UPS or the EEOC about UPS.    The facts do not reflect any other serious service failures at Gibbs's unit within the six months before or after this one serious service failure.  Further, the facts do not reflect that Ray's own conduct contributed to and/or increased the scope of the service failure.

Bob Kibler

Bob Kibler was a Caucasian Business Manager in the Birmingham package center who also reported to Diaz.  Kibler testified that Diaz was a "hard division manager" who raised his voice and yelled at Kibler at times, and had threatened constantly to demote Kibler and place him on MPIP.  Diaz never followed through on these threats directed at Kibler, but Diaz pointed out to Kibler "whatever he was looking at that day, whatever was not on par that day ... and if it stayed that way for any length of time at all, then – then the threats got heavier."  (Kibler Dep. Doc. 36-10, at 14, pp. 55-56).  Kibler considered Diaz's constant threats to be "humiliating" and felt that many times the complaints Diaz raised about matters in Kibler's operation were unfounded because they involved fluid matters over which he had no control, such as weather. *Id.* at 15 pp. 57-60.  Kibler testified that Diaz on occasion refused to give him days off when he requested them. No evidence exists that three or more serious service failures occurred at

Kibler's unit within a six month period. Further, the facts do not reflect that Kibler's own conduct contributed to and/or increased the scope of any service failure occurring in his unit.

## II. STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).   The non-moving party must "go beyond the

pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282.

Even if a district court "'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (*quoting Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)). The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253. After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

### III.  DISCUSSION

The motion for summary judgment requests the court to enter summary judgment in favor of UPS on the two remaining federal claims set forth in the Complaint. The court had previously

20

granted "Plaintiff's Partial Motion to Dismiss," stating that Redd agreed to the voluntary dismissal of Counts Three and Four.  (Doc. 13).  The Counts that remain to be addressed here are Count One—Retaliation in violation of Title VII and the Civil Rights Act of 1866; and Count Two—Racial Discrimination in violation of Title VII and § 1981.

### A.  Retaliation

"Title VII [ ] prohibits retaliation against an employee 'because [h]e has opposed any practice made an unlawful employment practice [by Title VII], or because [he] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder].'" *Crawford v. Carroll,* 529 F.3d 961, 970 (11th Cir. 2008) (quoting 42 U.S.C. § 2000e-3(a)).  Because Redd presents no direct evidence of retaliation, the court first evaluates this claim by using the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973).  Under that framework, Redd must present a *prima facie* case of retaliation.  To establish a *prima facie* case of retaliation, a plaintiff must show that "(1) [he] engaged in statutorily protected activity; (2) [he] suffered a materially adverse employment action; and (3) there was a causal link between the two."  *Dixon v. Hallmark Cos.,* 627 F.3d 849, 856 (11th Cir. 2010).

In the retaliation section of his brief, Redd focuses on Diaz's treatment of him and then Garrett's demotion of him as his retaliation claims.

### 1.  Retaliation Based on Diaz's treatment of Redd

UPS argues that, as to any alleged retaliation by Diaz, Redd has failed to establish the element of causation in his *prima facie* case.

"To establish causal connection, a plaintiff must show that 'the decision-maker[s] [were] aware of the protected conduct ....'" *Gupta v. Fla. Bd. of Regents,* 212 F.3d 571 (11th Cir. 2000) (quoting *Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322 1337 (11th Cir. 1999), *Gupta abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006); *see also Henderson v. FedEx Express,* 442 F. App'x. 502, 506 (11th Cir. 2011) (citing with approval *Gupta's* statement that the decision-maker's awareness of the protected conduct is a required showing to establish causation in a retaliation case). In 2013, the Supreme Court of the United States explained that Title VII retaliation claims "must be proved according to principles of 'but-for causation.'" *Univ. of Texas Sw. Med. Ctr. v. Nassar,* ___ U.S. ___, 133 S. Ct. 2517, 2533 (2013).

In the instant case, Redd presents no evidence that Diaz was *aware* that Redd had engaged in statutorily protected activity *prior to* Diaz's allegedly hostile treatment of him. Evidence does exist that Redd engaged in protected activity before Diaz arrived in Birmingham and allegedly began treating him harshly: Redd complained in October of 2008 about Mowery's treatment of him and raised the question whether the treatment was racial. Evidence also exists that Sciro and Poulter at UPS were aware of those complaints, but not that Diaz knew about them. Diaz became the Division Manager for the Alabama District in the Fall of 2009, *approximately one year after Redd complained about Mowery*, and Diaz arrived from out of state. Diaz had no communication with Mowery about Redd; Diaz testified that he did not receive any assessments of his new charges and considered all to have a clean slate. Redd pointed to no evidence that anyone told Diaz about Redd's prior complaints of discrimination, retaliation, or disparate treatment. Without evidence of Diaz's awareness of the prior protected

22

conduct, Redd cannot establish any causal connection between the protected conduct and Diaz's alleged adverse treatment. Accordingly, the court FINDS that Redd has failed to establish his *prima facie* case of retaliation based on Diaz's treatment of him.[10]

To the extent that Redd argues that "UPS" was aware of Redd's protected activity in complaining about Mowery and was aware that Diaz was a harsh supervisor with many allegations of discrimination lodged against him in Kansas, and thus, UPS placed Diaz as Redd's supervisor to punish him and retaliate against him, the court rejects that argument as implausible. *See Ashcroft v. Iqbal,* 556 U.S. 662, 677-680 (2009); *Bell Atlantic v. Twombly,* 550 U.S. 544, 554-563 (2007). No evidence exists that the UPS personnel who were aware of Redd's protected activity engineered Diaz's transfer to Alabama to retaliate against him.

For all of these reasons, the court FINDS that the motion for summary judgment is due to be GRANTED as to the claim of retaliation based on Diaz's treatment of Redd.

---

[10] The court acknowledges UPS's objection to Redd's argument characterizing Diaz's treatment as a retaliatory hostile work environment claim; UPS argues that a retaliatory hostile work environment claim is not properly before the court, as Redd failed to plead it in his Complaint. The court understands UPS's frustration, and notes, that, although paragraph 6 in the Administrative Procedures section of the Complaint mentions the term "hostile work environment," that term does not re-occur in the fact section of the Complaint or elsewhere, that term is not specifically linked in the Complaint to retaliation, and the term "hostile work environment" is not stated in the text of Count One. However, the court FINDS that whether Count One presents a claim of retaliation based on a specific adverse action(s) of Diaz *or* based on an alleged retaliatory hostile work environment that Diaz created, *any retaliation claim based upon Diaz's treatment must fail because no evidence exists of Diaz's awareness of any prior protected conduct.* Similarly, any attempt to present a retaliation claim based on Diaz's conduct must also fail under the "convincing mosaic" of discrimination theory set out in *Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321 (11th Cir. 2011). Further, the retaliation claim fails because the alleged retaliatory conduct is too remote in time to establish a causal connection based on Diaz's treatment. *See* discussion of law regarding temporal proximity in section 2.a. of this opinion; *see also Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir. 2004) (finding a 3-month period between the protected conduct and alleged retaliation to be insufficient, standing alone, to create inference of causation).

2.  Retaliation based on Garrett's Demotion of Redd

Redd also argues that Garrett's demotion of Redd from Business Manager to On-Road Supervisor in 2010 was in retaliation for protected activity.  UPS argues that Redd has not met his *prima facie* case of retaliation because he has failed to establish a causal connection between his protected activity and his demotion, and, further, he has not established that UPS's legitimate, non-discriminatory reasons for demoting Redd were pretextual.

*a.  Prima Facie Case - Causation*

In his brief, Redd attempts to establish causation by timing, explaining that "[t]he most compelling evidence of retaliation in this case is the timing of events related to UPS's decision to demote Plaintiff."  (Pl.'s Br., Doc. 40, at 35).  Accordingly, the court will recount the timing of events in the four months preceding Redd's demotion.  Redd filed his EEOC Charge on March 5, 2010.  In April of 2010, three UPS African Americans met with Redd—Harry Wilson from HR; Lonzell Wilson who investigated EEOC complaints; and Garrett who was his supervisor—to discuss Redd's complaints, including his EEOC Charge.  They told Redd that if he would drop his Charge, other employees would drop theirs.  In June of 2010, a serious service failure occurred on Redd's watch, the *third* serious service failure under his management within six months, and an investigation ensued, resulting in Garrett's determination that Redd had not handled the June incident correctly.  On June 11, 2010, UPS responded to Redd's EEOC Charge.  On July 19, 2010, Garrett demoted Redd.  As is clear from this timeline, four months had elapsed between the EEOC Charge and the demotion, whereas only a month-and-a-half elapsed between the June 2010 service failure and the demotion.

As Redd acknowledges, for temporal proximity to provide the basis for causation in a

retaliation action, the protected activity and the adverse job action must be "very close." *Clark*

*Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001) (citing with approval decisions finding

a 3-4 month period to be insufficient); *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir. 2004).

In *Higdon,* the Eleventh Circuit, examining and applying the Supreme Court's *Clark* decision,

noted that the Supreme "Court cited with approval decisions in which a three to four month

disparity was found to be insufficient to show causal connection ... (citing *Richmond v. ONEOK,*

120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient) and *Hughes v. Derwinski,* 967

F.2d 1168, 1174-75 (7th Cir. 1992) (4-month period insufficient)." *Higdon*, 393 F.3d at 1220.

In light of that guidance, the Eleventh Circuit found in *Higdon* that "[by] itself, the three month

period between the September 29 letter and the December 31 incident does not allow a

reasonable inference of a causal relation between the protected expression and the adverse

action." *Id.* at 1221.

In support of his causation argument, Redd cited the *Clark* case.  However, the court

questions whether that case provides him with any meaningful support; the *Clark* decision cited

with approval  *O'Neal v. Ferguson Const. Co,* 237 F.3d 1248, 1253 (10th Cir. 2001), stating that

"a three-month period, standing alone, is insufficient to establish causation."  Redd also cites as

support the unpublished case of *Shannon v. Potter,* which finds that plaintiff Shannon "failed to

establish any causal link between the alleged adverse actions and his protected expression"

because his complaints were filed "months before any of the[ ] alleged adverse actions . . . ." 335

F. App'x. 21, 26 (11th Cir. 2009) (complaints occurred in March and November of 2004 and the

first alleged employment action took place in February 2005).  In *Shannon,* the Eleventh Circuit

also cited with approval the decision of *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1361 (11th Cir. 2007), which specifically stated that a "three to four month disparity between the statutorily protected expression and the adverse employment action is not enough."

Applying this law to the instant case, the four month period between the March EEOC Charge and the July demotion does not, by mere timing itself, allow a reasonable inference of causation. The court is unclear when UPS first learned of the EEOC Charge, but the evidence reflects that UPS personnel knew about it at least by April of 2010 when they met with Redd, three months before the demotion. Thus, even the cases on which Redd relies do *not* support his claim that the period between protected expression and adverse action is close enough *in and of itself* to establish the element of causation.

Although Redd attempts to start the time clock rolling at events *after* the protected action, such as the date that UPS responded to the EEOC Charge, the cases cited look instead to the date of the protected activity. Because the date of the EEOC charge was March 5, 2010 and the date of his demotion was July 19, 2010, a four-month disparity exists between the two. Redd calls the timing of events "the most compelling evidence of retaliation," but, given the clear direction of the Eleventh Circuit and the Supreme Court, that four-month timing instead compels a finding of no causation, unless Redd provides sufficient evidence of causation *in addition to* mere timing.

Redd provides no further evidence of causation, unless his focus on the April 2010 meeting and the fact that the EEOC Charge remained pending represents such evidence. The court disagrees that this meeting represents *additional* evidence of causation, although it does confirm that UPS personnel had notice of Redd's Charge by that date. According to Redd, UPS personnel told him at an April 2010 meeting that if he would withdraw his EEOC Charge, others

26

would do so, but Redd did not agree to drop his Charge.  This evidence indicates a period of three months between the demotion and the time UPS learned that Redd would continue to pursue his Charge and the demotion, which period still does not meet the "very close" requirement, as discussed above. Accordingly, the court FINDS that Redd has failed to establish causation based on temporal proximity of the protected activity to the adverse action.

In addition to the timeliness factor, the undisputed facts show another impediment to establishing causation: Redd must establish that his protected activity was the "but-for" cause of his demotion.  In 2014, the United States Supreme Court explained in its decision of *University of Texas Southwest Medical Center v. Nassar,* that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation [motivating factor] test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  133 S. Ct. at 2533.  Thus, to establish "but-for" causation, Redd must establish that the EEOC charge was *the* factor that made a difference in his demotion; i.e., the demotion would not have occurred without the protected activity.

However, the undisputed facts in the instant case show that a serious service failure occurred on Redd's watch in June of 2010—three months *after* his protected activity and the month *before* his demotion.   An investigation ensued, Redd's African American  direct supervisor determined that Redd failed to manage the situation appropriately, and UPS demoted Redd in July.

The undisputed facts reflect that, although the June 2010 incident originated in a belt breakage outside of Redd's control, Redd's own failures contributed to the magnitude of the

27

service failure.  For example, undisputed facts show that Redd left UPS premises on June 3 after

giving operations personnel an inaccurate count of the packages affected, with over 160 packages

not included in the number and not scanned, and also show that Redd failed to immediately

advise UPS operations personnel when he learned of the inaccuracies on June 4, but rather,

waited for operations personnel to learn from another source.  In light of the undisputed

evidence, including but not limited to this example *and* the evidence that the June 2010 incident

was the third serious service failure on Redd's watch in six months, a jury could not reasonably

find that the EEOC Charge filed four months before the demotion was the "but-for" cause of that

adverse employment action.

For all of these reasons, the court FINDS that Redd has failed to establish the element of

causation, and thus, has failed to establish his *prima facie* case of retaliation as a matter of law.

The motion for summary judgment is due to be GRANTED on the retaliation claim set forth in

Count One.

> b.  *Pretext*

As an *alternative* ruling, the court FINDS that even if Redd had met his *prima facie* case,

he has not established that the legitimate, non-discriminatory reasons for the demotion—the three

serious service failures occurring within the preceding six month period, including the one in

June 2010, plus Redd's own failures contributing to the magnitude of the service failure in June

2010—were a pretext for retaliation.

Under the *McDonnell Douglas* framework, if the plaintiff succeeds in presenting a *prima*

*facie* case, the defendant must articulate a legitimate, non-discriminatory and non-retaliatory

reason for its actions.  If defendant does so, plaintiff must show that the articulated reason is

28

merely a pretext for retaliation.  *Berman v. Orkin Exterminating Co.,* 160 F.3d 697, 701-02 (11th Cir. 1998).

The Eleventh Circuit has explained that in asserting pretext, a plaintiff "must confront the employer's seemingly legitimate reason ... 'head on and rebut it.'" *Kidd v. Mando Am. Corp.,* 731 F.3d 1196, 1206 (11th Cir. 2013) (quoting *Chapman v. AI Transp.,* 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc)).  In turn, this court's "inquiry is limited to whether the employer gave an honest explanation of its behavior."  *Elrod v. Sears, Roebuck, & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991).  To do so, he must "cast sufficient doubt on the defendant's proffered ... reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Cooper-Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir. 1994)).  He can do that by demonstrating "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'"  *Combs,* 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3rd. Cir. 1996)).  However, a plaintiff "'cannot succeed by simply quarreling with the wisdom of that reason ....'" *Kidd,* 731 F.3d at 1206 (quoting *Chapman v. AI Tranport,* 229 F.3d 1012, 1030 (11th Cir. 2000)); *see Alexander v. Fulton Cnty., Ga.,* 207 F.3d 1303, 1341 (11th Cir. 2000) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not [] motivated [by discrimination or retaliation].").

In the argument section of his brief, Redd neither identifies nor discusses any comparator working under Garrett, the decision-maker, who had three or more serious service failures within

29

a six month period but had no protected conduct and was not disciplined.  Redd has neither

identified nor discussed in the argument section of his brief any employee working under Garrett

whose own failures contributed to the magnitude of the service failure but who had no protected

conduct and was not disciplined.   Redd has not otherwise met the legitimate, non-discriminatory

reason for demotion head-on; he has not presented evidence of inconsistencies, incoherencies, or

contradictions  that would cause a reasonable factfinder to determine that UPS's reason was

unworthy of credence and that would raise a genuine issue of material fact as to pretext.

Accordingly, as an *alternative* ruling, the court FINDS that the motion for summary judgment is

due to be GRANTED on the retaliation claim in Count One because Redd has failed to establish

that UPS's legitimate, non-discriminatory reason for the demotion was pretext for retaliation.

### B.  Disparate Treatment Discrimination Based on Race

In Count Two, Redd asserts disparate treatment based on race brought pursuant to both

Title VII and § 1981.  Because Title VII and § 1981 "have the same requirements of proof and

use the same analytical framework[,]" the court's analysis will apply to both.  *See Standard v.*

*A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998).

1.  *McDonnell Douglas* Analysis

As Redd provides no direct evidence of discrimination, the court first applies the burden-

shifting framework established in the *McDonnell Douglas* decision to analyze these claims.  411

U.S. 792 (1973). To establish his *prima facie* case for disparate treatment in a race discrimination

case, Redd must show that "he is a member of a protected class; (2) he was qualified for the

position; (3) he suffered an adverse employment action; and (4) he was replaced by a person

outside his protected class or was treated less favorably than a similarly-situated individual

outside his protected class." *Maynard v. Bd. of Regents,* 342 F.3d 1281, 1289 (11th Cir. 2003). In its brief supporting the motion for summary judgment, UPS challenges whether Redd established the third and fourth elements.

### a. Element Three

One element of the *prima facie* case that UPS challenges is element three, the existence of an adverse employment action.  In his race discrimination claim, as clarified in his responsive brief, Redd points to two employment actions as adverse and discriminatory: Diaz's placement of Redd on an MPIP and Redd's demotion.  UPS does not dispute that Redd's demotion is an adverse employment action, but it does dispute that placement on MPIP represents one.

In its challenge to this element, UPS argues that placing Redd on MPIP is not an adverse employment action because it is not a "*serious and material change* in the terms, conditions, or privileges of employment," and, thus, does not meet the Eleventh Circuit's definition of that term.  (Def.'s Br. Doc. 35, at 19) (quoting language in *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original *Davis* opinion).  "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances."  *Davis,* 245 F.3d at 1239.  Indeed, "not all conduct by an employer negatively affecting an employee constitutes [an] adverse employment action."  *Id*. at 1238.

UPS cites unpublished district court cases finding that placement on a MPIP/PIP, in and of itself, does not constitute an adverse employment action.  Although those cases are not controlling precedent, the court has noted their reasoning.  In *Carroll v. Ceridian Benefits Servs,* No. 11-CV-1063*,* 2012 WL 5431007, at *7 (M.D. Fla. Nov. 7, 2012), the court found that

"putting Plaintiff on a PIP was not an adverse employment action" and cited as support the Eleventh Circuit's unpublished opinion of *Jarvis v. Siemens Med. Solutions USA, Inc.,* 460 F. App'x 851, 858 (11th Cir.  2012).

In *Jarvis,* the Eleventh Circuit did not address the placement on a PIP as an adverse employment action under the differential treatment discrimination claim.  Rather, the Court stated that the plaintiff proffered termination as an adverse employment action and found that the plaintiff had met his *prima facie* case based on that adverse action.  It affirmed the district court's grant of summary judgment in favor of the defendant employer because the plaintiff had failed to meet his burden of establishing that the defendant's reasons for the termination were pretext for discrimination. The only discussion of PIP occurred during the analysis of the retaliation claim. Based on this discussion, the plaintiff in *Jarvis* apparently did not argue that the placement on PIP was an "adverse employment action" as an element of the *discrimination* claim but argued that it was a "materially adverse action" as an element of the *retaliation* claim.  As the Eleventh Circuit explained in *Jarvis,* "a 'materially adverse action' in the context of a retaliation claim means that the action 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"   460 F. App'x 851, 856-58 (11th Cir. 2012) (quoting *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)).

Courts have explained that a materially adverse action in the context of a retaliation claim is different and somewhat broader than the analysis of an adverse employment action in the context of a disparate treatment claim and "has no application to substantive Title VII discrimination claims."  *See Crawford,* 529 F.3d at 974 n. 14 .  Thus, the unpublished *Jarvis* decision's discussion of the PIP in the context of a retaliation claim does not provide controlling

guidance.  The court notes, however, that the Eleventh Circuit's analysis of the PIP placement focused on whether the placement affected his eligibility for a transfer or in other ways limited his employment opportunities within the company.  Finding that no evidence reflected that the PIP placement adversely affected the plaintiff, the Court of Appeals found that it did not qualify as an adverse action.  460 F. App'x at 859.

Similarly, the district courts in other unpublished cases UPS cited, *Johnson v. Gwinnett Cnty. Sch. Dist,* No. 11-CV-471- RGV, 2012 WL 5987584, at *10 (N. D. Ga. Oct. 17, 2012) (discussing a race discrimination claim) and *Smith v. CA, Inc.,* No. 07-CV-78, 2008 WL 5427776, at *7 (M. D. Fla. Dec. 30, 2008) (discussing a race discrimination claim) conclude that the plaintiff's placement on a professional development plan or a professional improvement plan did not constitute an adverse employment action supporting a claim of race discrimination because the plan did not materially affect the terms and conditions of employment; the Florida case stated that his PIP placement "did not result in a change to his compensation or his position" but merely required the plaintiff to improve his performance to comply with "policies already in existence" prior to his PIP placement.

However, the court notes that a district court sitting in the Middle District of Florida in *Murdick v. Catalina Marketing Corp.,* 496 F. Supp 2d 1337, 1357 (M.D. Fla. 2007) came to a different conclusion, finding that placement on a PIP was an adverse employment action for the purposes of summary judgment.  The court determined that the plaintiff had raised a genuine issue of material fact regarding whether placement on a PIP directly contributed to a tangible adverse action, his termination.

33

Keeping the discussion in these non-controlling cases in mind, the court looks to the circumstances of the instant case to determine whether the placement on the MPIP materially affected the terms and conditions of Redd's employment.  The facts presented do not reflect that the placement on the MPIP resulted in a change to his compensation, benefits, or his position, although Redd may well have felt that the extra oversight was annoying and even subjectively humiliating.  Further, no evidence reflects that it led to his demotion; rather, the evidence reflects that Diaz—who placed Redd on MPIP—was transferred out of the Birmingham office, and Redd's next direct supervisor—who demoted Redd—was not even aware that Redd had been operating on MPIP.  Accordingly, the court FINDS that MPIP placement is not an adverse employment action under the circumstances of this case.  The court FINDS that the motion for summary judgment is due to be GRANTED as to the claim for race discrimination based on the MPIP placement.  However, Redd's demotion from Business Manager to On-Road Supervisor is an adverse employment action; Redd meets element three of his *prima facie* case with that adverse employment action only.

> b.  *Element Four*

Because placement on MPIP is not an adverse employment action in this case, the court analyzes the "similarly situated" element only as to Redd's demotion.  Redd states in his brief that the final element of his *prima facie* case as to the demotion is establishing that UPS treated similarly situated non-African Americans more favorably than he.  While a plaintiff may indeed establish the fourth element with such evidence, the court notes that the Eleventh Circuit has espoused an alternative means of establishing element four: presenting evidence that the plaintiff "was replaced by a person outside his protected class."  *See Maynard,* 342 F.3d 1281; *see also*

*Winborn v. Supreme Beverage Co.,* No. 12-16324, 2014 WL 3397677, *1 (11th Cir. July 14, 2014) (per curiam); *Smith v. CH2M Hill, Inc.,* 521 F. App'x 773, 775 (11th Cir. 2013); *Frazier v. Doosan Infracore Intern., Inc.,* 479 F. App'x 925, 932 (11th Cir. 2012) (all quoting with approval *Maynard's* statement of element four).

In the instant case, Redd presented undisputed evidence that, upon his demotion, UPS replaced him with Debbie Bundrum, a white female. Accordingly, the court FINDS that Redd has established element four and has met his *prima facie* case as to the demotion.

### c.  Pretext

When a plaintiff establishes his *prima facie* case under the *McDonnell Douglas* framework, the defendant "must articulate a legitimate, nondiscriminatory reason for the challenged action." *Chapman v. AI Transp.,* 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). The court FINDS that UPS has done so in stating that Redd was demoted because he mishandled the June 3-4, 2010 incident in several respects and because the incident was the third serious service failure on Local Sort within a six-month period.

Therefore, Redd now bears the burden at the pretext step to proffer sufficient evidence to permit a reasonable factfinder to conclude that the employer's legitimate, nondiscriminatory reason was "a pretext for discrimination." *Vessels v. Atlanta Indep. Sch. Sys.,* 408 F.3d 763, 771 (11th Cir. 2005). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman,* 229 F.3d at 1030. Rather, the employee must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons ... that a

35

reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997) (quotation omitted).   To show pretext, a plaintiff must provide "concrete evidence in the form of specific facts." *Bryant v. Jones,* 575 F.3d 1281, 1308 (11th Cir. 2009).  "[C]onclusory allegations and assertions" will not suffice." *Id.*

In support his pretext argument, Redd first argues that the evidence reflects that "UPS ranked [Redd] in the top third of managers."  (Pl.'s Br. Doc. 40, at 31).   The court disagrees that any evidence so reflects.  Although Redd does not elaborate on this argument, the court must assume that Redd refers to the January 2010 Scorecard, which does not specifically *rank* Redd personally as a manager.  It merely ranks UPS operation areas as a whole for a one-month period, and ranks the Birmingham Central Package unit as ninth out of Alabama's thirty-three units for that month.  Diaz specifically testified in his declaration that the purpose of the Scorecards is *not* to measure the performance of individual Business Managers, and the Scorecards are *not* valid measures of any particular Business Manager's performance because "many of the elements reflected on the scorecard do not correlate to things within an individual manager's control and there are factors that might improve or reduce the ranking of areas of operation listed on the [Scorecards] for which a Business Manager has no accountability or right to claim credit."  (Diaz Decl. Doc. 36-5, at 10).

Even assuming *arguendo* that looking a number of Scorecards over a longer period might possibly provide evidence about which operations performed and ran well, a Scorecard for one isolated month does not provide helpful evidence about one manager's performance ranking. Further, as Redd was placed under MPIP in January 2010, and was receiving extra guidance and extra monitoring in January 2010, logic would not support an argument that the January 2010

Scorecard provided an accurate ranking of his unassisted managerial expertise.   To the extent, if

any, that the Scorecard reflected each manager's expertise instead of each operation's

performance based on a variety of factors, the January Scorecard could have represented Local

Sort's best ranking because Diaz had become was so involved in managing and monitoring Redd

under the MPIP; *if* the Scorecards provide any information about the performance of individual

Business Managers, the more helpful months to gauge Redd's performance would have been the

months leading up to his placement on MPIP or even the months after Diaz left, when Redd was

performing without extra assistance and monitoring. In sum, the January 2010 Scorecard

evidence does not contradict or render implausible or unbelievable UPS's reasons for demoting

Diaz.

Redd also argues that his own "testimony would allow a jury to believe that he did

nothing wrong in his handling of the service failure."  (Pl.'s Br. Doc. 40, at 31).   In a pretext

analysis when the quality of a plaintiff's work is at issue, the question is not whether the

employer's opinion is incorrect or unfounded.  Rather, the question is whether the employer is

dissatisfied because of a nondiscriminatory reason, even if the reason is incorrect or unwise, *or*

whether the reason is merely a cover for discrimination.  *See Alvarez v. Royal Atl. Dev., Inc.,* 610

F.3d 1253, 1266 (11th Cir. 2010).

Put another way, the proper inquiry is whether the employer *believed* the employee was

guilty of misconduct and whether that belief was the reason for the adverse employment action.

*Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991) (an ADEA case, stating

that the "inquiry ... is limited to whether [the employer] *believed* that [the employee] was guilty

of [misconduct] and if so, whether this belief was the reason behind [his] discharge"); *Hawkins v.*

*Ceco Corp.,* 883 F.2d 977, 980 n. 2 (11th Cir. 1989), *cert. den.* 495 U.S. 935 (1990) (stating whether the employee engaged in misconduct reported to the employer is irrelevant because the true inquiry is whether the employer believed he had committed misconduct).  Thus, the employee's opinion about his own performance and disagreement with the employer's evaluation of the appropriateness of his actions or the quality of his work does not necessarily raise a genuine issue of material fact as to pretext; it is often irrelevant to the true issue, which is what the employer believed and whether this belief, true or not, was the reason for the adverse action.

In the instant case, testimony from the African America decisionmaker, Garrett, reflects that Garrett believed Redd mishandled matters on the evening of June 3 and the morning of June 4.  Nelson's testimony reflects the same conclusion. In contrast, Redd asserted that he was not wrong in relying on Martin to scan and count the packages without further actions from Redd following-up and confirming that Martin had completed his tasks.  Redd provides the testimony of another Business Manager, Kibler, stating that a manager can direct those under him to count and scan, but Kibler also states that the Business Manager "would want to make sure [the tasks after a breakdown] were done correctly ... because you were going to be asked questions and you would want to be able to give good answers."  (Kibler Dep. Doc. 36-10, at 19, p. 76).  This testimony does not fully support Redd's assertion that he could unconditionally rely on his supervisor to scan and count packages without personally verifying that those jobs were performed adequately.

But, again, Redd's evaluation of his own actions is irrelevant unless it sheds light on what the employer believed and whether that belief was the reason for his demotion.  The testimony of Garrett and Nelson indicated that Redd should be able to rely on those under him to perform

tasks, but the responsibility ultimately rested on Redd as the manager to verify that the tasks were completed.   And although the Redd's supervisors may disagree with Redd over what actions he should have taken on the evening of June 3, even Redd does not argue that his inaction on the morning of June 4—failing to notify Nelson of the incorrect undelivered package numbers when he learned about them early that morning and waiting until another manager notified her—was appropriate.   Even if Redd is right and Garrett is wrong, Garrett's holding the manager ultimately responsible when tasks were not completed under his watch is a reasonable, logical one and does not raise the specter of pretext, unless Garrett, an African American, held white managers to a lesser standard.    Accordingly, the court must next look to comparators.

In the pretext part of his brief, Redd addresses the comparator issue generally, asserting conclusorily that "[o]thers were not terminated for similar or worse infractions."  While that statement is less than helpful, the court will give Redd the benefit of the doubt and assume he is referring the court back to the comparator discussion under the *prima facie* case, where Redd identified Jeff Gibbs and David Ray as alleged comparators.

To be a proper comparator, the Eleventh Circuit requires that "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999).  Although a later panel called into question the Circuit's "nearly-identical" misconduct requirement, the Court of Appeals subsequently addressed that conflict head-on and re-affirmed the "nearly identical" misconduct requirement. *See Burke-Fowler v. Orange Cnty., Fla.,* 447 F.3d 1319, 1323 n. 2 (11th Cir. 2006); *see also Brooks v. CSX Transp., Inc.,* 555 F. App'x 878, 883 (11th Cir. 2014) (citing with approval the "nearly identical"

requirement).  In creating this requirement for comparators, the Eleventh Circuit has ensured that

the court's role is limited to determining "whether unlawful discriminatory animus motivates a

challenged employment decision" and not in acting "as a super personnel department that

second-guesses employers' business judgments. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d

1079, 1092 (11th Cir. 2004) (internal quotations and citations omitted).

      Redd identifies Gibbs and Ray, both Caucasians working under Garrett, as comparators,

and presumably as supporting pretext, because they received citations for serious service failures

but Garrett did not demote them.  Although Redd argues that Garrett did not distinguish the

service failures of Gibbs and Ray from those of Redd and rule them out as comparators, the court

disagrees.  Garrett explained in his declaration several reasons why he demoted Garrett that

would not apply to other comparators, including Gibbs and Ray.  Garrett did *not* state that he

demoted Redd because a belt breakage occurred on Redd's watch resulting in undelivered

packages and a serious service failure.  Rather, Garrett concluded that, on June 3-4, 2010, Redd's

conduct had compounded the initial service failure based on the belt breakdown with several

*additional* mistakes: he and his team significantly underreported the number of undelivered

packages; Redd left on the evening of June 3 without exhausting efforts to deliver the remaining

packages through scheduled tractor trailers or non-routine means such as specially dispatched

package car to drive the packages to other UPS hubs;  many of the packages did not receive

proper scans meaning that the UPS customers would be unable to track the deliveries; and on the

morning of June 4, when Redd was notified that the number of undelivered packages was

underreported, Redd personally failed to notify Nelson and waited for her to learn of it from

another source.  These *additional* mistakes are what Garrett focused on in demoting Redd, not

the fact that a belt breakage occurred in Local Sort.  While Redd's action/inaction compounding the scope of the service failure may well have distinguished the June 3-4 incident from other service failures, Garrett testified in his declaration that his decision to demote Garrett was *also* based in part on Garrett's knowledge of two previous serious service failures occurring on the Local Sort in 2010 under Redd's watch.

As to the alleged comparators, the evidence presented does *not* reflect that the service failures occurring within the purview of Ray and Gibbs involved compounded errors similar to those occurring on June 3-4, 2010 and does not reflect a personal failure of Ray or Gibbs to report to operations personnel the correct scope of the service failure.  Further, the evidence does not reflect that *three* or more serious service errors occurred under the leadership of either Ray or Gibbs within a six-month period.   Accordingly, the court FINDS that the circumstances involving Ray and Gibbs do not meet the "nearly identical" requirement, and FINDS, in any event, that the circumstances of the service failures involving Redd are not similar enough to those of Ray or Gibbs to raise a specter of pretext.  Given that the court is addressing situations and comparators that are not sufficiently similar, the court should not and will not act as a super-personnel department, second-guessing UPS's business judgment where Redd has not raised a genuine issue of material fact that those judgments were a pretext for race discrimination.

To the extent, if any, that Redd proffers Kibler as a comparator, the evidence does not reflect that service failures on Kibler's unit involved compounded errors similar to those occurring on June 3-4, 2010 and does not reflect a personal failure of Kibler to report to operations personnel the correct scope of the service failure.  Further, the evidence does not reflect that *three* or more serious service failures occurred under Kibler's leadership.

41

Accordingly, the court FINDS that the circumstances involving Kibler do not meet the "nearly identical" requirement, and FINDS, in any event, that the circumstances of the service failures involving Redd are not similar enough to those of Kibler to raise a specter of pretext.

For all of these reasons, the court FINDS that Redd has failed to meet his burden to raise a genuine issue of material fact that UPS's reasons for demoting Redd were a pretext for race discrimination under Title VII or § 1981.

2. *Lockheed-Martin* "Convincing Mosaic" Analysis

In addition to Redd's attempt to survive summary judgment under the *McDonnell Douglas* framework, he also cites the decision of *Smith v. Lockheed-Martin Corporation,* 644 F.3d 1321 (11th Cir. 2011), quoting its language that "the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. . . .The plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent [by presenting] a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* at 1328. Redd raises *Lockheed-Martin's* "convincing mosaic" alternative to the *McDonnell Douglas* framework as to the claim that Diaz discriminated against Redd, arguing that even if Diaz's treatment of Redd does not constitute an adverse employment action and even if no white comparator exists as to Diaz's treatment, Redd can still succeed by presenting circumstantial evidence that pieces together such a mosaic.

In raising the "convincing mosaic" means to survive summary judgment, Redd must present the mosaic tiles of circumstantial evidence to the court. "The [c]ourt does not bear the

burden of discerning this evidence for him, and federal courts do not 'guess' at what a litigant

might mean." *King v. ST Aerospace Mobile, Inc.,* No. 12-CV-0360, 2013 WL 2635926, at *18

(S.D. Ala. June 11, 2013).  After *Lockheed-Martin,* the Eleventh Circuit continues to apply the

*McDonnell-Douglas* framework and affirm grants of summary judgment when plaintiffs do not

meet their *prima facie* case under it and when plaintiffs do not present a convincing mosaic of

circumstantial evidence that would allow a jury to infer intentional discrimination.  *See, e.g.,*

*Giles v. Daytona State College, Inc.,* 542 F. App'x 869, 872-73 (11th Cir. 2013) (affirming grant

of summary judgment where plaintiff failed to meet her *prima facie* case by demonstrating that

defendant treated similarly situated employees more favorably and failed to create a triable issue

concerning defendant's discriminatory intent); *Turner v. Fla. Prepaid College Bd.,* 522 F. App'x

829, 832-33 (11th Cir. 2013) (affirming the grant of summary judgment on the race

discrimination claim where the plaintiff failed to present a similarly situated comparator and

stating "we have never suggested that a plaintiff's generalized averment that her employer treated

her differently than employees of a different race can, alone, create a 'convincing mosaic of

circumstantial evidence' from which a jury could find intentional discrimination").

    In the instant case, the only specific circumstantial evidence that Redd points to in the

section discussing *Lockheed-Martin* is evidence that Diaz placed Redd on a MPIP even though

"Redd was never the worst employee on the Alabama District Balanced Scorecard, and in the

month he was placed on the MPIP he was ranked **ninth out of thirty-one**."  (Pl.'s Br. Doc. 40, at

28) (emphasis in brief).  The court has already addressed this evidence under the pretext section

of this opinion, and determined that it was unhelpful as a measure of Redd's personal,

unmonitored and unassisted  performance, as it included a period when he was monitored and

assisted under MPIP.  That Scorecard does not establish a mosaic or even add substantial mosaic tiles.

Redd also states rather conclusorily that "there is evidence Diaz harbored racial animosity toward Redd and other employees."  Even if that were true, then Redd must do more than present that conclusion to the court; he must build that mosaic with the evidentiary pieces.  He has failed to do so, and he cannot expect the court to build it for him.  In any case, Diaz's placement of Redd on MPIP was not accompanied by any change in position, salary, or benefits, and when Diaz was transferred out and Garrett took his place, Garret was not even aware of Redd's MPIP placement when he demoted him.  The court FINDS that Redd has failed to present circumstantial evidence that would create a genuine issue of material fact concerning UPS's alleged discriminatory intent.

### IV.  CONCLUSION

For all of these reasons, the court FINDS that the motion for summary judgment is due to be GRANTED as to the claims in Counts One and Two; the court will ENTER SUMMARY JUDGMENT in favor of Defendant UPS and against Plaintiff Redd on the claims in Counts One and Two.  As the court had previously granted the Plaintiff's voluntary motion to dismiss the other claims, no claims remain, and this case will be closed.

The court will enter a separate Order consistent with this Memorandum Opinion.

Dated this 24th day of September, 2014.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE